**SIGNED THIS: September 22, 2010**

_____
**THOMAS L. PERKINS**
**UNITED STATES CHIEF BANKRUPTCY JUDGE**

_____

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| RAYMOND J. SEVER and | ) | Case No. 08-81432 |
| LINDA A. SEVER, | ) | |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| ASSOCIATED BANK, N.A., a national | ) | |
| banking association, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. No. 08-8124 |
| | ) | |
| RAYMOND J. SEVER and | ) | |
| LINDA A. SEVER, | ) | |
| | ) | |
| Defendants. | ) | |

## O P I N I O N

This matter is before the Court after trial on the complaint filed by Associated Bank,

N.A. (ASSOCIATED), against Raymond J. Sever, the Debtor ("Sever" or the "DEBTOR"),

objecting to both the dischargeability of its debt and the DEBTOR'S discharge.[1] The claim in Count I of the complaint seeks a determination that the debt to ASSOCIATED is nondischargeable under section 523(a)(4) of the Bankruptcy Code, alleging that the DEBTOR engaged in fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny. The claim in Count II, based on section 727(a)(2)(A), alleges that within one year of the commencement of the bankruptcy, the DEBTOR, with the intent to defraud creditors, transferred, removed, or concealed property of the estate. Count III, premised on section 727(a)(3), seeks denial of discharge based upon a failure to keep books and records. The claim in Count IV, based on section 727(a)(4), alleges that the DEBTOR knowingly and fraudulently made false oaths and omissions in connection with his bankruptcy case. In Count V, brought under section 727(a)(5), ASSOCIATED alleges that the DEBTOR failed to satisfactorily explain the loss of assets. Lastly, in Count VI, ASSOCIATED alleges that the DEBTOR committed the acts specified in Counts II through V, as an insider of Players Turf International, LLC (PTI), in violation of section 727(a)(7).[2]

**Facts and Background**

For several years before the filing of the bankruptcy petition, the DEBTOR was the manager and 83.027% member of PTI, a business engaged in the sale and installation of

---

[1]Although the complaint also named Linda Sever as a Defendant, ASSOCIATED conceded that it would not pursue the claims as against her.

[2]From the configuration of ASSOCIATED'S complaint, it is not clear which of the allegations of Counts II through V relate to the DEBTOR in his case and which relate to the DEBTOR'S actions in connection with PTI'S bankruptcy. Moreover, ASSOCIATED further confounds its claims against the DEBTOR by asserting some forty-seven particularized allegations in a common count and nearly identical, generalized factual bases in each of Counts II, IV and V. Given the complaint's obscurity, the Court will focus upon the arguments made by ASSOCIATED in its post-trial submissions.

synthetic turf.[3]  In order to obtain operating funds, PTI executed ten separate promissory notes with ASSOCIATED totaling $2,196,089.85.  The notes were secured by a mortgage on the business property in Chillicothe and a first security interest in accounts, equipment, inventory and general intangibles.  PTI ceased is operations at the end of September in 2006.  Around that same  time, Players Turf Systems, LLC ("PTS"), a limited liability company engaging in the same business as PTI, was formed.  ASSOCIATED sued PTI in state court, seeking an order of replevin for its collateral and a judgment against PTI and the Severs as guarantors of the debt.

PTI filed a voluntary Chapter 11 petition on July 24, 2007, with hopes of a quick sale of  substantially all of its assets under section 363 of the Bankruptcy Code.[4]  The Statement of Affairs discloses that Kubota Credit repossessed a 2004 Kubota Tractor and front loader in mid-November, 2006, and that Caterpillar Credit repossessed a 2003 tractor during that same period.  Among the assets listed on Schedule B were accounts receivable totaling $78,722; machinery, fixtures and equipment worth $775,090; vehicles valued at $120,097; and a copyright for "Players Turf."  An itemized list of the receivables was attached to the schedules.

On August 9, 2007, ASSOCIATED sought relief from the stay to proceed with an auction sale of the personal property.  PTI opposed the motion, alleging that it was engaged in negotiations with a potential buyer for the sale of all of the assets.  At the hearing on October 5, 2007, Sam Bobby, a potential purchaser, appeared and requested

---

[3]According to the Statement of Affairs filed in *Players Turf International, LLC*, Case No. 07-81583, there were three other members of the LLC, with two members owning 7.072% each and the third member owning 2.829%.

[4]Case No. 07-81583.

additional time to complete his appraisal of the property.  ASSOCIATED had not initially

sought stay relief as to the real estate and the matter was continued to October 19, 2007.

At that hearing, ASSOCIATED advised the Court that it had not received a noncontingent

offer for the purchase of the assets and PTI withdrew its opposition to ASSOCIATED'S

motion.  Orders were entered on October 24, 2007, granting ASSOCIATED relief from the

stay.  The case was converted to Chapter 7 on November 21, 2007, after it was determined

that the DEBTOR possessed certain vehicles, machinery and equipment not encumbered

by ASSOCIATED'S lien.  The TRUSTEE collected $45,697.  After selling its collateral at

auction on December 6, 2007, ASSOCIATED amended its proof of claim to account for the

net auction proceeds of $269,291.11, to a deficiency balance of $1,540,433.10.  According to

the TRUSTEE'S final report, ASSOCIATED received a distribution of $32,856.47.  The case

was closed on April 6, 2010.

The DEBTOR and his spouse filed a Chapter 7 petition on May 29, 2008.  In the

Statement of Financial Affairs, the DEBTOR reported that he had no income for 2008.  On

November 18, 2008, DEBTORS amended the Statement of Financial Affairs, to disclose that

Raymond earned $6,000 in 2008.  ASSOCIATED filed a claim under the Guarantees for a

total of $1,691,021.18, including principal of $1,236,053.96, interest of $310,805.76, late fees

of $7,305.87 and attorney fees of $136,855.59.

ASSOCIATED brought this adversary proceeding in the DEBTOR'S individual

bankruptcy case, seeking denial of his discharge and objecting to the dischargeability of its

debt.  The matter was tried before the Court on March 31, 2010.  Both the DEBTOR and

William Richter, Vice President of ASSOCIATED, testified at trial.  In addition, the

depositions of Sam Bobby, a potential investor in PTI and Ken Smith, the President of PTS,

were admitted.  At the conclusion of the trial, the Court took the matter under advisement

and requested briefs from the parties.

## ANALYSIS

Before proceeding to an analysis of the merits, several preliminary observations

need be made.  By reason of the judgment obtained on the DEBTOR'S guaranties of PTI'S

debt, ASSOCIATED is a creditor of the DEBTOR and has standing to object to the

dischargeability of that debt and to the DEBTOR'S discharge.  However, ASSOCIATED

makes no contention that there was any fraud in the inception of that debt, when the

DEBTOR signed the guaranties in early 2004.  With the exception of ASSOCIATED'S claim

that the DEBTOR made false statements in his petition and at the first meeting of creditors,

regarding his lack of income and denial of ownership of any vehicles, ASSOCIATED'S

broad based attack against the DEBTOR seeking denial of his discharge, stems from

various actions taken by the DEBTOR, not in connection with his own case, but in

connection with the bankruptcy petition and case involving PTI.   Specifically,

ASSOCIATED asserts that the DEBTOR defrauded creditors by transferring and concealing

assets of PTI; failed to keep books and records for PTI; made false oaths regarding the

creation and control of PTS and the sale of assets of PTI; and failed to satisfactorily explain

what happened to PTI'S receivables after 2005 and the disposition of two tractors.

## OBJECTIONS TO DISCHARGE

A denial of discharge is an extremely harsh and drastic penalty. *In re Lindemann*, 375

B.R. 450 (Bank.N.D.Ill. 2007).  As such, it is reserved for the "truly pernicious debtor."  *In*

*re Johnson*, 98 B.R. 359, 367 (Bankr.N.D.Ill. 1988).  Consistent with the goal underlying the

Bankruptcy Code of affording debtors a "fresh start," the grounds for denial of discharge listed in section 727 are liberally construed in favor of debtors and strictly against objectors. *Matter of Juzwiak*, 89 F.3d 424 (7th Cir. 1996). The objector seeking denial of discharge bears the burden of proving each of the elements of the applicable claim by a preponderance of the evidence. *In re Scott*, 172 F.3d 959, 966-67 (7th Cir. 1999).

## Section 727(a)(7) Reachback Period

Section 727(a)(7) provides that a court may deny a debtor's discharge if the debtor has committed an act specified in certain of the subsections of that provision on or within one year before the date of the filing of the petition, or during the case, in connection with a bankruptcy case "concerning an insider." In asserting its claim under section 727(a)(7), ASSOCIATED overlooks a critical element of this provision. Essentially, this provision extends the basis for denial of the discharge to the debtor's misconduct in or preceding a related bankruptcy case, but not if the conduct occurred more than one year prior to the debtor's filing. This provision was explained by the court in *Whiteside F.S. Inc. v. Siefkin*, 46 B.R. 479, 481 (N.D.Ill. 1985):

> The purpose and intent of Section 727(a)(7) of the Bankruptcy Code is to prevent debtors who are involved in several bankruptcy proceedings from failing to cooperate in a proceeding in which their own discharge is not at issue such as a corporate proceeding or a proceeding involving a partner or a relative and then, subsequently or simultaneously, obtaining an individual discharge in another case. Section 727(a)(7) is a statutory provision which ties related cases together so that misconduct in one case by an individual may be chargeable against that individual in other related proceedings.

PTI ceased its operations in September, 2006. Its Chapter 11 petition was filed on July 24, 2007, and the case was converted to Chapter 7 on November 21, 2007. The DEBTOR did

not file his Chapter 7 petition until May 29, 2008.   Application of this provision requires that

the debtor have "committed [an] act" of the type specified in section 727(a)(2), (3), (4), (5),

or (6) of the Bankruptcy Code "in connection with" another case either during or within one

year before the filing of the petition of the debtor's own case.   *In re Korfonta*, 2009 WL

4571852 (Bankr.E.D.Va. 2009); *See In re Landes*, 201 B.R. 399, 405 (Bankr.E.D.Pa. 1996).

Accordingly, the reach back extends only to actions of the DEBTOR which occurred after

May 29, 2007, encompassing only the two-month period prior to the filing of PTI'S Chapter

11 petition.[5]  As discussed below, this limited time frame operates as an absolute bar to most

of the claims asserted by ASSOCIATED.

### Section 727(a)(2)(A) PrepetitionTransfers of Property in Connection with PTI

Section 727(a)(2)(A) provides that a court shall grant a debtor a discharge unless "the

debtor, with intent to hinder, delay or defraud a creditor . . . has transferred, removed,

destroyed, mutilated, or concealed . . . property of the debtor, within one year before the

date of the filing of the petition."   In order to prevail under this provision, a plaintiff must

prove by a preponderance of the evidence that (1) the debtor; (2) transferred, removed,

destroyed or concealed; (3) the debtor's property; (4) with actual intent to hinder, delay, or

defraud a creditor.  *Village of San Jose v. McWilliams*, 284 F.3d 785 (7th Cir. 2002).   Essentially,

the exception consists of two components: an act, i.e., a transfer or a concealment of

property, and an improper intent, i.e., a subjective intent to hinder, delay or defraud a

creditor.  *In re Kontrick*, 295 F.3d 724 (7th Cir. 2002).  Because direct evidence of a fraudulent

intent is usually unavailable, fraudulent intent may be inferred from the debtor's actions

---

[5]The DEBTOR does not contest his status as an insider of PTI.

and may be proved by circumstantial evidence. *Matter of Yonikus*, 974 F.2d 901 (7th Cir. 1992). In determining whether a debtor has acted with intent to defraud, the debtor's "whole pattern of conduct" should be considered. *Lindemann, supra.* Denial of discharge need not be premised on an intent to defraud, but also upon an intent to hinder or delay the objecting creditor. *In re Butler*, 377 B.R. 895 (Bankr.D.Utah 2006).

To prevail on this objection, ASSOCIATED must establish that, within a year before the date the DEBTOR filed his petition, he transferred, removed, destroyed, or concealed PTI'S property with the intent to hinder, delay, or defraud PTI'S creditors. The factual predicate for ASSOCIATED'S objection - a recurrent theme that runs through each statutory ground for exception raised by ASSOCIATED – is that when PTI began to encounter financial difficulties in 2005, the DEBTOR concealed or misappropriated assets belonging to PTI which should have been used to pay ASSOCIATED'S claim. More specifically, ASSOCIATED maintains that the DEBTOR funneled various assets from PTI to a series of new LLCs, of which he was at the helm. The primary evidence supporting its theory was the opening of a new bank account in April, 2005, at a different financial institution, unbeknownst to ASSOCIATED, into which PTI began to deposit its collected receivables and from which it paid its operating expenses. According to ASSOCIATED, approximately $729,119.32 was deposited into the account from April, 2005, to November, 2009. Mr. Richter testified that he believed that the DEBTOR orchestrated the formation of PTS and that he was running that company in 2006.[6] It is his belief that the start-up funds of $140,000

---

[6]Richter, a vice president of ASSOCIATED, is an audit program supervisor and handles problem loan workouts. He testified as a fact witness not an expert. During his testimony, however, he stated certain beliefs, opinions and conclusions about the DEBTOR'S conduct and motives. That kind of opinion testimony may only be admissible if offered by a forensic accountant admitted as an expert, which Richter was not. The Court places no weight on Richter's opinions or deductions as proof of those assertions.

were accounts receivable diverted from PTI.  ASSOCIATED also relies upon a represen-

tation made by the DEBTOR to Mr. Richter at a meeting in the summer of 2006, that the

balance of PTI'S accounts receivable was approximately $200,000.  ASSOCIATED maintains

that PTI'S purported sale of its trade name, website, logo and other intangible assets to Ken

Smith in October, 2006, was a charade.  ASSOCIATED relies upon the deposition testimony

of Ken Smith that he did not purchase the intangible assets but instead made a loan of

$25,000 to PTS in order that it could purchase those assets.

ASSOCIATED also claims that the DEBTOR intended to defraud ASSOCIATED by

transferring a Kubota and a Caterpillar tractor to PTS in November, 2006, and concealing

that transfer.  Although ASSOCIATED acknowledges that the tractors were each subject to

purchase money security interests of other creditors and that its interest in the equipment

was subordinate, ASSOCIATED believes that PTI had equity in both pieces of equipment.

No evidence was introduced as to either the equipments' fair market value or the loan

balances at the time of the transfers.[7]  The basis for this contention is an e-mail from the

DEBTOR to his attorney, regarding the transfer of PTI'S equipment, wherein the DEBTOR

states that he advised his bankruptcy attorney that PTI no longer had possession of the

encumbered equipment, but did not inform him of "PTS, the new company or myself."

ASSOCIATED also points to a second e-mail from the DEBTOR boasting that the equipment

was acquired for nearly $20,000 under the market value. [Ex. 40].  Notwithstanding an

executed purchase agreement, ASSOCIATED maintains that the DEBTOR continued to use

those assets for his new companies.

---

[7] In his testimony, Mr. Richter made reference to the amounts shown in PTI'S records as being owed on the equipment.

As previously discussed, in order to prevail under this exception, ASSOCIATED is required to establish that the specific actions that it complains of fell within the one year period preceding the filing of the DEBTOR'S petition. ASSOCIATED'S objection is, in large part, premised upon the DEBTOR'S opening of an account at National City and the diversion of receivables to that account, actions which were taken well before May, 2007. There was no evidence to establish that the DEBTOR in fact collected receivables or exercised control over PTI'S assets subsequent to the end of May, 2007, a time which was just two months shy of the filing of PTI'S Chapter 11 petition. When the petition was filed on July 24, 2007, PTI scheduled receivables in the amount of $78,722, attaching an itemized list and listed the National City account as having a balance of $5,000. No deposits were made to that account during the months of April or May, 2007, and the last deposit made prior to that date was on March 23, 2007, in the amount of $1,323.06. The transfer of the Cat and Kubota tractors, taking place in 2006, also fall outside the relevant time period. Although the DEBTOR admitted that he had taken some of the funds from the National City account for his personal use during the relevant time period, those monies were later returned to the account and the balance was eventually turned over to ASSOCIATED.

At trial, the DEBTOR testified that the bank account was established at National City on the advice of PTI'S attorney, because ASSOCIATED had placed some restrictions on the availability of funds deposited in PTI'S account, making it difficult to continue its operations. The DEBTOR denied that PTS was his company and denied that Ken Smith was president in name only. According to the DEBTOR'S testimony, Ken Smith and the other principals of the company often sought his advice. An asset purchase agreement, dated

October 15, 2006, whereby PTI sold its trade name to PTS, for $25,000, was admitted into evidence. A deposit of $25,000 was made to the National City account on November 13, 2006. Ken Smith's criticism of the DEBTOR and his "mismanagement" while working for PTS centered around his extensive traveling to sell jobs and the continued investment of profits from existing projects into subsequent jobs.

The Court believes that the DEBTOR was a truthful witness. His testimony was forthright. The DEBTOR, a high school graduate with no training in accounting, candidly admitted that he was a good salesman but a poor bookkeeper. Ken Smith's desire to distance himself from any position of ownership in or leadership of PTS is not surprising, given his testimony that the IRS came knocking at his door. His testimony that he agreed to be president of PTS as a "favor" is incredible. Sam Bobby, employed as a consultant by PTI for a short period near its demise, concluded that PTI'S major problem was extensive cost overruns resulting from underbidding and that every project ended up in the red. In his opinion, the DEBTOR did not misappropriate any funds, but worked very hard to save the business, forgoing his salary when PTI could not afford to pay it. That the receivables owed PTI on the date the petition was filed turned out to be substantially less than ASSOCIATED anticipated, does not lead to the conclusion that the accounts were siphoned off by the DEBTOR. The Court concludes that ASSOCIATED failed to establish that the DEBTOR concealed any assets or that he transferred any assets to a company which he

controlled.[8]   Moreover, there is no evidence in the record that funds belonging to PTI,
deposited into the National City account were ever, as ASSOCIATED contends, used for
purposes other than to pay creditors of PTI.

Moreover, in order to prevail under section 727(a)(2), ASSOCIATED is required to
establish that when the acts were committed, the DEBTOR harbored the intention of
defrauding ASSOCIATED.   ASSOCIATED failed to prove that the DEBTOR acted with the
intent to hinder, delay or defraud ASSOCIATED.   ASSOCIATED makes much of the
formation of the new entities, as circumstantial evidence of an intent by the DEBTOR to
hinder, delay or defraud ASSOCIATED, but the weight of the evidence is to the contrary.

According to the public records of the Illinois Secretary of State, PTI was formed on
June 13, 2000, with Ray Sever identified as its registered agent and as the sole manager of
the LLC.  According to the public records of the Kansas Secretary of State, PTS was formed
on October 19, 2006, as a Kansas LLC.  Ken Smith is identified as the registered agent at his
Overland Park address, which is also identified as the LLC'S business address.  PTE was
formed on May 25, 2007, as an Illinois Corporation using a Chicago firm as its registered
agent.  These public records corroborate the DEBTOR'S testimony that Ken Smith was the
principal person behind PTS and Sam Bobby was behind PTE.  PTE never did any business.
PTS apparently attempted to take over the business after PTI ceased operations, but that
attempt was short-lived and unsuccessful.

PTI filed its Chapter 11 petition on July 24, 2007.  The timing of the filing was driven
by the fact that ASSOCIATED was scheduled to auction PTI'S real estate and equipment on

---

[8]According to Mr. Bobby's testimony, at the time he was considering purchasing the assets of PTI, he created Players
Turf Enterprises, Inc. (PTE).  He was the sole shareholder, director and officer.  When he was unable to reach an
agreement with ASSOCIATED, the corporation was dissolved on February 13, 2008.

July 25, 2007.  The auction was scheduled pursuant to a judgment issued by the Peoria County Circuit Court in Case No. 06 CH 307, commenced on May 17, 2006, when ASSOCIATED filed its complaint for foreclosure.  The purpose of the Chapter 11 case was not to reorganize PTI'S business but to sell its assets for a more favorable price than might be obtained by ASSOCIATED at a foreclosure sale.

According to its schedules, PTI had gross income in 2005 of $1,368,278, but incurred a net loss of $275,752.  In 2006, it grossed $617,618, and lost $578,870.  It had no income in 2007.  The schedules also state that the 2004 Kubota Tractor and front loader, and the 2003 Caterpillar 277 Tractor, were repossessed in 2006 by the purchase money lenders.  Two 2004 Ford F-350 trucks were repossessed in January, 2007, by Ford Motor Credit.

The schedules reflect that PTI conducted some business in 2006, but ceased operations that year.  The cessation was caused, at least in part, by PTI'S inability to negotiate a work-out with ASSOCIATED leading to two lawsuits.  The first, filed on May 9, 2006, as Peoria Count Case No. 06 CH 289, was simply a suit to collect on the notes and the personal guaranties. A money judgment was entered by default jointly against PTI and Raymond and Linda Sever on August 28, 2006, in the amount of $1,587,386.  The second, filed May 17, 2006, sought to foreclose on ASSOCIATED'S mortgages on real estate and personal property security interests.

By autumn, 2006, workout negotiations between ASSOCIATED and PTI had failed, PTI and the DEBTORS, individually, had $1.5M judgments against them, and ASSOCIATED was proceeding to repossess and sell its collateral, which was essentially almost all of the business assets.  The only thing PTI continued to do was to attempt to collect its receivables

for the benefit of ASSOCIATED and to which ASSOCIATED acquiesced.

Given the large judgment against him, it is understandable that the DEBTOR did not want to have any ownership interest in PTS and, in fact, he did not take such an interest. Ken Smith testified that the DEBTOR put no money into PTS and that Richard Racioppi was the sole owner of PTS based upon his initial contribution of $60,000.

Despite the consternation it caused ASSOCIATED, there was nothing inherently wrongful about the DEBTOR'S involvement with PTS.  Nothing bound him to work for PTI indefinitely or until ASSOCIATED released him.  Nothing prevented him from taking his knowledge, expertise and contacts to a different enterprise.  What the DEBTOR couldn't do was take assets that were subject to ASSOCIATED'S lien to a new enterprise, so as to deprive ASSOCIATED of the value of its collateral.  ASSOCIATED obviously suspected that he did so, but failed to prove it.

The DEBTOR denied transferring substantial assets from PTI to PTS, with the exception of the Kuboto and Caterpillar tractors, which were subject to purchase money liens and ultimately repossessed by the lienholders.  The DEBTOR'S testimony was corroborated by Ken Smith who testified that the only piece of equipment transferred to PTS was the Caterpillar tractor; no other equipment or inventory was transferred to his knowledge.  Without proof of the equity value in those vehicles, the claim fails.  The cryptic email about a $20,000 benefit to PTS is inconclusive and, by itself, unpersuasive.

Sam Bobby testified that the DEBTOR was looking for investors to fund the business and for a finance or accounting person to help set up an effective internal accounting system.  Bobby was reluctant to invest because he wasn't familiar with the artificial turf

industry and because the business's books and records were not kept in accordance with generally accepted accounting principles. As a result, Bobby was unable to get a handle on the value or profitability of the business. Instead of investing, Bobby agreed to work as a financial consultant to set up a better accounting system. He consulted for five or six months, receiving no compensation other than a "loan" for $50,000 funded by Richard Racioppi. Ultimately, Bobby decided the business did not have enough value to justify acquiring an ownership interest.

Bobby testified that neither the DEBTOR, individually, nor PTI, ever paid him anything. From his time with the business, Bobby saw a pattern of underbidding jobs and not charging for changes, extras or punch-list repairs. The "profit" that was built into each bid, was consistently exceeded by extra expenses. In Bobby's view, the DEBTOR never figured out how to run the business profitably.

ASSOCIATED'S attorney questioned Bobby specifically about the expenses charged to the business by the DEBTOR and the salary or other compensation paid to the DEBTOR. Bobby testified that the expenses that he saw were all customary and not excessive. He testified that he never saw the DEBTOR take money from the company other than for his salary and that he never took money for non-business reasons. Bobby testified that there were times that the DEBTOR did not take his salary because the money was needed for another project.

In anticipation of acquiring an ownership interest, Bobby set up PTE as a new entity to go forward with the new accounting system in order to make a clean break from the past financial uncertainties. PTE was incorporated on May 25, 2007. Prior to that, the DEBTOR

asked Bobby to meet with ASSOCIATED to let the bank know that he was a potential investor.[9]  Bobby met with Richter and was advised that the bank had already taken possession of the building and the equipment and intended to sell those assets at auction. Bobby's potential involvement did not alter ASSOCIATED'S intentions.

Bobby indicated that both the DEBTOR and Ken Smith were heavily involved in the sales or marketing side of the business, attempting to find new customers and new jobs.  He testified that the DEBTOR wanted to focus on sales and not be saddled with the responsibility of managing the business.  The recruiting of Smith to set up PTS and serve as its president is consistent with Bobby's testimony.

To Bobby's recollection, the name "Players Turf" was not trademarked, and he had little interest in PTI'S intellectual property.  Bobby wrote a letter dated May 3, 2007, to Lisa Binder at ASSOCIATED expressing a desire to purchase PTI'S assets.  The letter states that the DEBTOR directed Bobby to ASSOCIATED and its attorney.  Bobby offered to purchase the assets for $300,000, but ASSOCIATED rejected the offer and did not counter, advising him that he could bid at the public auction.

In conjunction with the formation of PTE, Bobby opened an account at National City Bank.  He denied that any collections from PTI'S receivables were deposited into PTE'S account.  He stated that only monies from the Lentz project and an Arizona project, both PTE jobs, were deposited into the account.  The funding for those jobs came from the customer deposits or advance payments, not from receivables generated from prior PTI jobs. Bobby made certain to keep PTE separate from PTI because he wanted nothing to do with

---

[9]Even at that late date, the DEBTOR was still hoping to achieve a consensual workout with ASSOCIATED.

16

PTI or its residual liabilities.

The testimony of Sam Bobby as well as Ken Smith, for the most part, corroborates the DEBTOR'S version of events and contradicts ASSOCIATED'S claims. The formation of PTS and PTE is not the smoking gun that ASSOCIATED makes it out to be. At the time these new companies were formed, ASSOCIATED had already accelerated PTI'S indebtedness, enforced the personal guaranties, taken a large money judgment against PTI and the DEBTORS, and was in the process of enforcing its liens on the real estate and personal property of PTI in state court. ASSOCIATED'S actions had already effectively put PTI out of business. If Ray Sever wanted to continue to earn a living in the artificial turf industry, PTI was no longer available for use as an operating entity for that purpose.

ASSOCIATED points to the contradiction between Smith and Sever about who was really controlling PTS, an issue that has little relevance to the claims asserted in this adversary proceeding. It is clear that both Smith and Sever were primarily acting as salespeople. It is also clear that Sever, for sure, and Smith, probably, were not effective managers and were incapable of addressing the severe accounting and financial problems that plagued the business. Bobby was a competent finance person, but his involvement was too little, too late.

But Sever's shortcomings as a businessman don't equate to fraud. And the creation of new entities doesn't establish that assets were improperly transferred or that creditors were hindered, delayed or defrauded. It is particularly difficult for ASSOCIATED to establish that Sever's continuation of the business via PTS or PTE somehow hindered, delayed or defrauded the bank, when it was exercising all of its collection and foreclosure

rights in state court.  ASSOCIATED has failed to prove its claims under section 727(a)(2).

## Section 727(a)(4) False Oaths and Omissions

Under section 727(a)(4), a debtor may be denied a discharge if the debtor, knowingly and fraudulently made a false oath or account, in or in connection with the case.  In order to prevail under this provision, a plaintiff must establish (1) that the debtor made a statement under oath, (2) that such statement was false, (3) that the debtor knew the statement was false, (4) that the debtor made the statement with fraudulent intent, and (5) that the statement related materially to the bankruptcy case. *Matter of Agnew*, 818 F.2d 1284 (7th Cir. 1987).  A false statement on a debtor's schedules or statement of financial affairs may constitute a false oath. *In re Senese*, 245 B.R. 565 (Bankr.N.D.Ill. 2000).  While the intent to defraud must be actual and not constructive, reckless disregard for the truth is regarded as the equivalent of fraud for purposes of this provision. *Matter of Yonikus*, *supra*.  The requisite intent may be inferred from circumstantial evidence. *Village of San Jose v. McWilliams*, *supra*.  A falsehood resulting from mistake or mere inadvertence, should not result in denial of the discharge. *In re Von Behren*, 314 B.R. 169 (Bankr.C.D.Ill. 2004).  The subject matter of a false oath is material if it relates to the debtor's estate, discovery of assets, disposition of property or a debtor's entitlement to discharge. *In re Bailey*, 147 B.R. 157 (Bankr.N.D.Ill. 1992).  A false statement or omission that has no impact on a bankruptcy case is not material. *In re Khalil,* 379 B.R. 163, 172 (9th Cir.BAP 2007).  An omission of an asset that has little or no value may be immaterial. *Bailey,* 147 B.R. at 163-64.

ASSOCIATED does not identify any false oaths or accounts concerning the schedules and statement of financial affairs filed by the DEBTOR on behalf of PTI in its bankruptcy

case.  Nor does ASSOCIATED point to any false testimony which was given by the DEBTOR  in PTI'S bankruptcy case.

ASSOCIATED contends that the DEBTOR made two false oaths in connection with his own bankruptcy case.  First, ASSOCIATED contends that the DEBTOR failed to disclose that he earned income of $6,000 during the month of January, 2008, from Players Turf Systems, LLC.  Second, ASSOCIATED contends that the DEBTOR'S statements that he was only an employee of PTS and did not control that business were false.

Based upon the testimony at trial, the Court finds that ASSOCIATED failed to establish by a preponderance of the evidence that the DEBTOR "knowingly and fraudulently" made a "material" false oath.  The Court is satisfied that the DEBTOR'S omission of the income was a mistake which was not deliberate but rather due to oversight.  Moreover, the omission of the income on the schedule or the DEBTOR'S failure to advise the trustee at the first meeting had no impact upon the administration of his bankruptcy estate.  Such an innocuous mistake does not justify the denial of a discharge.  In its brief, ASSOCIATED also asserts that the DEBTOR testified falsely at a deposition taken in his bankruptcy that he was only an employee of PTS and that he had nothing to do with the operation of that company.  ASSOCIATED failed to establish the falsity of that statement.  Nor did ASSOCIATED establish that PTS was in fact the DEBTOR'S company and that he was in control of its operations.  The Court found the DEBTOR'S testimony in this regard to be more credible than the contrary testimony of Ken Smith.

**Section 727(a)(5) Unexplained Loss of Assets**

Section 727(a)(5) provides that "the debtor has failed to explain satisfactorily... any

19

loss of assets or deficiency of assets to meet the debtor's liabilities...." This provision calls for two stages of proof. *In re Hammitt*, 289 B.R. 670 (Bankr.C.D. Ill. 2001). First, the party objecting to discharge has the burden of proving that the debtor at one time owned substantial and identifiable assets that are no longer available for his creditors. As to the second, if the objecting party meets that burden, then the debtor is obligated to provide a satisfactory explanation for the loss. In order for an explanation to be considered satisfactory, it "must consist of more than...vague, indefinite and uncorroborated" assertions by the debtor. *Matter of D'Agnese*, 86 F.3d 732 (7th Cir. 1996), *quoting Baum v. Earl Millikin, Inc.*, 359 F.2d 811, 814 (7th Cir. 1996).

In order to prevail on its objection under this provision, ASSOCIATED must establish that the DEBTOR failed to satisfactorily explain any loss or deficiency of assets to meet PTI'S liabilities. Again, ASSOCIATED'S claimed "loss" of accounts receivable was not proved by the evidence. It is significant that ASSOCIATED permitted the DEBTOR to collect PTI'S receivables even after the state court suits were brought. ASSOCIATED had access to PTI'S records and the DEBTOR was subject to the jurisdiction of the state court. If ASSOCIATED suspected that collections were misappropriated by the DEBTOR, it could have raised the issue with the state court and taken over the collection process itself. It took no such action.

ASSOCIATED'S contention that the DEBTOR failed to provide a satisfactory explanation as to the loss of the Caterpillar and Kubota equipment is without merit. Those assets were transferred to PTS, PTS assumed the existing liabilities and the vehicles were subsequently repossessed by the dealer credit companies. ASSOCIATED has failed to establish by a preponderance of the evidence that there was a loss of PTI'S assets or a

20

deficiency of its assets, which the DEBTOR failed to explain satisfactorily.

## Section 727(a)(3) Failure to Keep Books and Records in Connection with PTI

ASSOCIATED also contends that the DEBTOR'S discharge should be denied under section 727(a)(3) which denies a discharge to a debtor who has "concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case." 11 U.S.C. § 727(a)(3). While the Bankruptcy Code does not impose a rigid standard of perfection, the records must be sufficient to give "a true presentation of the debtor's financial affairs." *In re Scott*, 172 F.3d 959, 969 (7th Cir. 1999). Essentially, a business must maintain adequate invoices of sales along with documentation which substantiates business expenses. *Matter of Juzwiak*, 89 F.3d at 429 n.2.

Any failure by the DEBTOR to keep books and records for PTI occurred long before the look-back period dictated by section 727(a)(7). *See In re Korfonta, supra* (rejecting theory of "continuing default"). PTI shut down in September, 2006. All that remained was the collection of accounts receivable. ASSOCIATED received no financial reports after that time, as it admits, because there were no ongoing operations. The state of PTI'S books and records during the time when it was operating is simply not germane to this proceeding. ASSOCIATED did not produce any evidence that any business records were "concealed" or "destroyed" or "mutilated" or "falsified".

In conclusion, the Court holds that the evidence, considered as a whole, fails to establish any basis for denial of the DEBTOR'S discharge.

## OBJECTION TO DISCHARGEABILITY

An action to determine the dischargeability of a debt under section 523(a) has two components. *In re Trovato*, 145 B.R. 575 (Bankr.N.D.Ill. 1991) (citing *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)). As the first step, the creditor must establish a debt owed by the debtor. Section 101(12) of the Bankruptcy Code defines "debt" as a liability on a claim and section 101(5)(A) defines "claim" as a right to payment. The term "claim" has been interpreted very broadly, to include all legal obligations of the debtor. *Pennsylvania Dept. of Public Welfare v. Davenport*, 495 U.S. 552, 110 S.Ct. 2126, 2130, 109 L.Ed.2d 588 (1990). Whether the creditor holds an enforceable obligation is determined by relevant substantive nonbankruptcy law. *Butner v. U.S.*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).

Once the creditor establishes a valid claim under nonbankruptcy law, the bankruptcy court turns to the provisions of section 523(a) to determine the issue of nondischargeability. A creditor seeking to establish an exception to the discharge of a debt bears the burden of proof. *Matter of Scarlata*, 979 F.2d 521 (7th Cir. 1992). A creditor must meet this burden by a preponderance of the evidence. *Grogan v. Garner*, *supra*. In order to afford the debtor a "fresh start," exceptions to discharge are construed strictly against the creditor and liberally in favor of the debtor. *Meyer v. Rigdon*, 36 F.3d 1375 (7th Cir. 1994).

### Section 523(a)(4) Fiduciary Fraud/Defalcation

ASSOCIATED has objected to the dischargeability of its debt under section 523(a)(4), based on fiduciary fraud or defalcation by a fiduciary. Section 523(a)(4) excepts from

22

discharge a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny." 11 U.S.C. § 523(a)(4). To prevail under the fiduciary fraud/defalcation prong of the statute, a creditor must prove that (1) a fiduciary relationship existed between the creditor and the debtor, (2) fraud or defalcation was committed by the debtor in the course of that relationship, and (3) the creditor suffered a financial loss as a result of the fraud or defalcation. *In re Beetler*, 368 B.R. 720 (Bankr.C.D.Ill. 2007).

The concept of a "fiduciary relationship" under Section 523(a)(4) is ultimately a question of federal law and the broad, general definition under state law, as one involving confidence, trust and good faith, is not controlling in the dischargeability context. *In re Petersen*, 296 B.R. 766 (Bankr.C.D.Ill. 2003). A fiduciary relationship does not arise simply because of a lender/borrower relationship or a borrower's failure to repay loans. *In re Hanson,* 432 B.R. 758, 780 (Bankr.N.D.Ill. 2010). It is well established that the term applies only to a fiduciary under an express or technical trust, which must exist prior to, or independent of, the transaction from which the contested debt arose. *In re Cochrane*, 124 F.3d 978 (8th Cir. 1997). Expressing its approval of this narrow interpretation, the Seventh Circuit Court of Appeals defined a fiduciary relationship as "a difference in knowledge or power between fiduciary and principal which . . . gives the former a position of ascendency over the latter." *Matter of Marchiando*, 13 F.3d 1111, 1116 (7th Cir. 1994). In *In re Frain*, 230 F.3d 1014, 1017 (7th Cir. 2000), the Seventh Circuit further delineated the definition of a fiduciary relationship for purposes of section 523(a)(4), holding that a 50% shareholder and chief operating officer of a closely held corporation who could not, under the terms of the shareholder agreement, be removed without his consent, possessed substantial power over the other two shareholders, which gave rise to a fiduciary relationship.

ASSOCIATED contends that the DEBTOR owed a fiduciary duty to it once it became clear that PTI was in financial difficulty and could not meet its obligations. ASSOCIATED maintains that the DEBTOR took assets which belonged to PTI, including two vehicles, the trade name and trademark, and funds in bank accounts, which should have been used to pay down ASSOCIATED'S debt. In response, the DEBTOR asserts that ASSOCIATED failed to establish when PTI became insolvent as well as failed to prove that the DEBTOR acted fraudulently or took any actions as a corporate officer of PTI which damaged the creditor body as a whole.

In asserting that the DEBTOR became a fiduciary of ASSOCIATED, ASSOCIATED invokes the long-standing principle of corporate law that corporate officers and directors generally occupy a fiduciary relationship towards their corporation and shareholders, but in the event of insolvency, the assets of the corporation are regarded as a trust fund for the payment of its creditors and the fiduciary relation shifts to the creditors of the corporation.[10] *See Paul H. Schwendener, Inc. v. Jupiter Elec. Co., Inc.*, 358 Ill.App.3d 65, 829 N.E.2d 818 (Ill.App. 1 Dist. 2005). Just as a shareholder's right to sue is derivative, a creditor has a right to assert such a claim, at most, only as a representative of the corporation and its creditors. Upon the corporation's filing of a bankruptcy petition, the trustee is the proper party to bring an action against a corporate officer for misappropriation of corporate funds. *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939). Several cases have held that an officer of an insolvent corporation occupies a "fiduciary" status within the scope of section

---

[10]As the court noted in *In re Mooney*, 2007 WL 2403774 (Bankr.D.N.H. 2007), given the similarities between limited liability companies and corporations, it is logical to assume that state law would impose the same fiduciary duty on members and managers of an insolvent limited liability company that are imposed upon the officers and directors of an insolvent corporation.

523(a)(4). *In re Burton*, 416 B.R. 539 (Bankr.N.D.W.Va. 2009); *In re Suhadolnik*, 2009 WL 801611 (Bankr.C.D.Ill. 2009) (J. Gorman) (denying motion to dismiss section 523(a)(4) count alleging debtor/guarantor concealed and dissipated assets of his two corporations); *In re Hussain*, 308 B.R. 861 (Bankr.N.D.Ill. 2004). This determination is predicated upon a position of ascendancy, resulting from the creditors' loss of equal knowledge and bargaining power upon insolvency, as expanded in *Matter of Marchiando, supra*.

Not all courts agree with the characterization of a corporate officer of an insolvent corporation as a fiduciary for purposes of section 523(a)(4). *In re McDermott*, 2010 WL 1780056 (Bankr.N.D.N.Y. 2010); *In re* Long, 774 F.2d 875 (8th Cir. 1985); *In re Stamou*, 2009 WL 1025161 (Bankr.D.N.J. 2009). The liability of an officer to the corporation and the creditor body for misappropriation of corporate funds, however, does not translate into recovery by an individual creditor, either before or after bankruptcy. *In re Bane*, 426 B.R. 152 (Bankr.W.D. Pa. 2010); *Kelley v. Conwed Corp.*, 429 F. Supp. 969 (E.D.Va. 1997); *In re Felt Mfg. Co., Inc.*, 371 B.R. 589 (Bankr.D.N.H. 2007); *In re Mooney, supra*. As pointed out by the court in *In re McDermott*, permitting a creditor of an insolvent corporation to assert a direct claim for breach of fiduciary duty under section 523(a)(4), "would ... expand nondischargeability to any and all creditors with claims against the assets of insolvent corporations," in contradiction to the Bankruptcy Code's fresh start policy.[11]

An equally serious flaw in ASSOCIATED'S theory is that it seeks a determination of nondischargeability on the full amount of the judgment obtained on the DEBTOR'S

---

[11]Fiduciary fraud or defalcation in this context, must be distinguished from a claim for willful and malicious harm to property under section 523(a)(6), which may be brought by a single creditor on its own behalf. *See, e.g., In re Peklar,* 260 F.3d 1035 (9th Cir. 2001); *In re Long, supra*. ASSOCIATED did not allege a cause of action under section 523(a)(6). Regardless, proof of conversion is lacking.

guaranty, by making a general allegation of fiduciary fraud that bears no causal nexus to its judgment.  In essence, ASSOCIATED is relying on a remedy which exists for the benefit of all creditors, to preserve its debt resulting from the guaranty.  The absence of a fiduciary relationship specifically between ASSOCIATED and PTI is dispositive.

*In re Strack*, 524 F.3d 493 (4th Cir. 2008), illustrates this difference.  In that case, the debtor was the president and majority owner of an equipment dealership.  Under its dealer agreement with a creditor/manufacturer, upon a sale of a piece of the creditor's equipment, the dealership was required to segregate the sale proceeds and to hold them in trust for the creditor.  After the dealership failed and the debtor filed Chapter 7, the creditor sought a determination of nondischargeability under section 523(a)(4), based on the debtor's guarantee of the dealership's obligation.  Relying on its earlier decision in *In re Ellison*, 296 F.3d 266 (4th Cir. 2002), the court based its determination of nondischargeability on the following four factors: (1) the debtor personally guaranteed the indebtedness; (2) the indebtedness arose due to defalcation or "the breach of a fiduciary relationship between two corporations;" (3) the debtor was personally responsible for the conduct which gave rise to the corporation's breach or defalcation; (4) the debtor's conduct itself was a breach of the debtor's fiduciary duty to his corporation.  *Strack*, 524 F.3d at 500.

There was no trust or independent fiduciary relationship here between PTI and ASSOCIATED.  *In re Brown*, 399 B.R. 44 (Bankr.N.D. Ind. 2008) (conduct of president of debtor corporation in setting up new bank account for deposits of receivables was not fraud or defalcation in a fiduciary capacity against lender with security interest in receivables).  Theirs was but an ordinary debtor-creditor relationship.  A contrary conclusion would

transform nearly every commercial credit transaction into a trust or fiduciary relationship.[12]

Likewise, in *In re Casini*, 307 B.R. 800 (Bankr.D.N.J. 2004), an insolvent corporation's

creditor pursued a section 523(a)(4) claim against one of the owners, Peter Casini, then in

a personal Chapter 7 case, alleging that Casini committed a fiduciary defalcation by

transferring valuable assets from the insolvent corporation to a series of new corporations.

Rejecting the creditor's theory, and determining that the creditor failed to prove he suffered

a loss as a result of the alleged defalcation, the court rejected the creditor's argument that

a diversion of any amount of corporate assets should render the creditor's prepetition

money judgment against Casini nondischargeable. *Id* at 819. The court reasoned as follows:

> There's an old saying, "you can't commit murder on a corpse." That
> applies to insolvent business entities. If Marine Investors was so far insolvent
> that it had no chance of paying its priority creditors, then unsecured creditors
> suffer no damage if the meager assets are dissipated. Graustein has no
> evidence to show that he would have recovered anything from Marine
> Investors, Inc. He has failed to prove any damages from Casini's alleged
> defalcation.

*Id.* That reasoning is equally applicable to ASSOCIATED'S fiduciary defalcation claim.

The foregoing discussion regarding the legal insufficiencies in ASSOCIATED'S claim

for fiduciary defalcation, is largely academic however, because, as previously detailed, the

evidence at trial fell well short of establishing that the DEBTOR failed to account for any

---

[12]The district court in *In re Sternberg*, 2010 WL 988550 (D.N.J. 2010), reviewing the development of the law under the predecessor of this provision, referred to the seminal case of *Chapman v. Forsyth*, 43 U.S. 202, 208, 2 How. 202, 11 L.Ed. 236 (1844), wherein the Supreme Court , holding that a factor who failed to remit the proceeds from the sale of goods, considered a fiduciary under the laws of agency, was not within the discharge exception, stated:

> If the act embrace such a debt, it will be difficult to limit its application. It must include all debts
> arising from agencies; and indeed all cases where the law implies an obligation from the trust
> reposed in the debtor. Such a construction would have left but few debts on which the law could
> operate. In almost all the commercial transactions of the country, confidence is reposed in the
> punctuality and integrity of the debtor, and a violation of these is, in a commercial sense, a disregard
> of a trust. But this is not the relation spoken of in the first section of the act.

money or property belonging to PTI or that he diverted assets to his personal use.

## Section 523(a)(4) Embezzlement

ASSOCIATED has also objected to the discharge of its debt based on embezzlement. Embezzlement is defined as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Matter of Weber*, 892 F.2d 534, 538 (7th Cir. 1989). One cannot embezzle one's own property. *Brown*, 399 B.R. at 47. Proof of a fiduciary relationship is not necessary in order to prevail based on the exception to discharge for embezzlement, but a showing of fraudulent intent is. It is well-settled, however, that a debtor who misappropriates a creditor's collateral, by using it for purposes other than repaying the creditor's loan, does not embezzle that property. *In re Algire*, 430 B.R. 817 (Bankr.S.D.Ohio 2010); *In re Kjoller*, 395 B.R. 845 (Bankr.W.D. N.Y. 2008); *In re Tomlinson*, 220 B.R. 134 (Bankr.M.D.Fla. 1998).

The Court concludes that ASSOCIATED has failed to prove its claim of nondischargeability. The DEBTORS are entitled to judgment on all counts. This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

###